UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **SHARRON COOK,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| v. | }   Case No.: 5:22-cv-676-MHH |
| | } |
| **DECATUR MORGAN HOSPITAL,** | } |
| | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

Sharron Cook's four-decade career with Decatur Morgan Hospital ended in July 2021. At the time, she was 66 years old. Ms. Cook alleges that the hospital wrongfully terminated her employment based on her age in violation of the Age Discrimination in Employment Act and the Alabama Age Discrimination in Employment Act. (Doc. 1). The hospital has asked the Court to enter judgment in its favor on Ms. Cook's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 11)[1]

This opinion opens with a statement of the legal standard that governs motions for summary judgment. Then, consistent with that standard, the Court summarizes

---

[1] In her complaint, Ms. Cook also asserted a discrimination claim and a retaliation claim against the hospital under the Americans with Disabilities Amendment Act of 2008. (Doc. 1). Ms. Cook concedes that the hospital is entitled to judgment in its favor on her ADA claims. (Doc. 14, p. 1 n. 1). Therefore, the Court will enter judgment on those claims for the hospital and will discuss in this opinion only Ms. Cook's age discrimination claims.

1

the evidence in the summary judgment record, presenting the evidence in the light most favorable to Ms. Cook, the non-moving party. Finally, the Court analyzes the evidence under the substantive law that governs Ms. Cook's age discrimination claims to determine whether there are disputed questions of material fact for a jury to resolve.

## I.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Because Decatur

Morgan Hospital moved for summary judgment, in this opinion, the Court presents the evidence in the light most favorable to Ms. Cook.

## II.

Ms. Cook began her career at the Decatur Morgan Hospital in 1974. (Doc. 10-1, p. 10, tp. 32). In 2013, Ms. Cook became the hospital's Director of Service Excellence, the position she held when she separated from the hospital. (Doc. 10-1, p. 11, tp. 34). As Director of Service Excellence, for several years, Ms. Cook reported to Noel Lovelace. (Doc. 10-1, p. 11, tp. 35).

In February of 2021, Ms. Lovelace told Ms. Cook that she soon would begin reporting to Amy Bippen. (Doc. 10-1, p. 11, tpp. 36-37). Ms. Bippen was the hospital's Service Line Director of Clinical Excellence. (Doc. 10-3, p. 9, tp. 28). Ms. Cook was upset by the news because she had been transferred several times during her tenure with the hospital, and she knew it was "a huge change when [she] transition[ed] to a new leader" because she had to "learn the new leader and what their expectation[s]" were. (Doc. 10-1, p. 12, tp. 38).

Ms. Cook asked for a meeting with Ms. Lovelace and Ms. Bippen. (Doc. 10-1, p. 13, tp. 42). In the meeting, Ms. Cook informed Ms. Lovelace and Ms. Bippen that she was planning to retire in September of that year because she was tired of being transferred to different leaders. (Doc. 10-1, p. 13, pp. 43–44). Ms. Cook felt that the combination of the transition and health issues that she was experiencing

3

"was just more stress than [she] felt like [she] could handle." (Doc. 10-1, p. 13, tp. 45).

On February 19, 2021, via email, Ms. Cook sent Karla Gray, the hospital's Director of Human Resources, her work and resignation plan. Ms. Cook copied Ms. Lovelace and Ms. Bippen on the message. (Doc. 10-4, p. 3). Ms. Cook indicated that she planned to "submit a formal resignation" by April 5, (Doc. 10-4, p. 3), and she noted on a 2021 calendar that she attached to her message that June 4, 2021 would be her "last day" at the hospital, (Doc. 10-4, p. 4). Ms. Cook also indicated that she planned to take several weeks of vacation and medical leave between February and June. (Doc. 10-1, p. 16, tp. 55; Doc. 10-4, p. 4). Ms. Gray replied on February 22, 2021 and informed Ms. Cook that her insurance coverage would "end the month that [she] last physically worked." (Doc. 10-4, p. 2).

After Ms. Cook informed Ms. Lovelace, Ms. Bippen, and Ms. Gray of her plan to retire, the hospital decided to distribute Ms. Cook's duties to Ashley Martin and Theresa Corey. (Doc. 10-1, p. 20, tp. 72). Ms. Cook understood that she was to train Ms. Martin and Ms. Corey before she retired. (Doc. 10-1, p. 20, tp. 72).

When Ms. Cook sent the February 2021 email describing her retirement plans, she had not considered the impact that her retirement would have on her insurance coverage. She knew she needed insurance coverage, so she contacted the Social Security Administration to explore when her benefits would become available to her.

(Doc. 10-1, p. 16, tpp. 54–56; Doc. 10-1, p; 68, tp. 265). When she learned that she could not receive her full retirement benefit through the Social Security Administration unless she worked until September of 2021, Ms. Cook decided to delay her retirement until then. (Doc. 10-1, p. 21, tp. 74; Doc. 10-1, p. 22, tpp. 80–81). On the morning of April 16, 2021, Ms. Cook emailed Ms. Bippen a new timeline that included an anticipated retirement date in September rather than June. (Doc. 10-1, p. 21, tp. 76; Doc. 10-9, p. 2). Ms. Cook sent a copy of the message to Ms. Martin, one of the employees who would be taking over her responsibilities when she retired. (Doc. 10-9, p. 2). In the message to Ms. Bippen, Ms. Cook stated that after she spoke to the Social Security Administration again on April 19, 2021, she would send a formal letter of resignation to designate "the specific last date in September" on which she would resign from the hospital. (Doc. 10-9, p. 2). In the message, Ms. Cook also notified Ms. Bippen that she would "be out starting Monday April 19th indefinitely following surgery on Wednesday April 21st," that she planned to take a family vacation from May 21, 2021 through May 31, 2021, and that she was planning to take a beach trip from September 9, 2021 through September 14, 2021. (Doc. 10-9, p. 2). Ms. Cook stated that the September beach

5

trip would be "in [her] resignation period," indicating that she planned for her last day with the hospital to be in September but after September 14, 2021.[2]

Ms. Cook reached out again on April 19 with information about her retirement. Ms. Cook sent an email message to Ms. Gray and copied Ms. Bippen. (Doc. 10-15, p. 2). Ms. Cook explained that she had discussed with Ms. Bippen that her final day with the hospital would be in September. Ms. Cook indicated that she would "submit [her] resignation closer to the current window at that time (30 days/6 weeks)." (Doc. 10-15, p. 2).

Between February 2021 when Ms. Cook began discussing her retirement and July 6, 2021, the hospital had a written resignation policy in place. (Doc. 10-5, p. 4). The policy provided that "[m]anagement employees at Nurse Manager or Director level or above must submit a five-week notice" if they wanted to "resign in good standing and be eligible for re-employment and their Earned Time Off." (Doc. 10-5, p. 4). The hospital would pay an employee who satisfied the requirements of the resignation policy accrued ETO. (Doc. 10-5, p. 4). Ms. Cook was a management employee at or above the Nurse Manager/Director level, so this provision of the hospital's resignation policy applied to her. In the resignation policy, the hospital reserved the right to "accept an employee's resignation on the day [it was]

---

[2] Ms. Cook took the family vacation in May 2021, and she used medical leave for surgery in April 2021. (Doc. 14-2, pp. 22-23).

submitted." (Doc. 10-5, p. 4). In addition, under the policy, if a management employee like Ms. Cook provided notice more than five weeks ahead of a planned resignation date, "the employee [could] work the full notice period," but the hospital "ha[d] the right to reduce the employment period." (Doc. 10-5, p. 4). Finally, the policy gave the hospital discretion to retain or discharge an employee who provided a notice of resignation but later decided to withdraw the resignation. (Doc. 10-5, p. 4).[3]

On June 16, 2021, during a conversation with Ms. Cook regarding her training of Ms. Corey and the time she was using for vacation in advance of her resignation, Ms. Bippen recommended to Ms. Cook that she retire earlier than September 2021. (Doc. 10-1, pp. 21–22, tpp. 77–78; Doc. 14-2, p. 13). Ms. Bippen memorialized the conversation in an email to Ms. Gray. In the June 16, 2021 message, Ms. Bippen wrote that she told Ms. Cook that she was "comfortable with her retirement occurring as soon as July." (Doc. 10-13, p. 2).

On the morning of July 1, 2021, Ms. Bippen responded to Ms. Cook's April 16, 2021 email message in which Ms. Cook indicated that she wished to change her retirement date from June to September. Ms. Bippen notified Ms. Cook that the

---

[3] The hospital updated its resignation policy on July 7, 2021. The terms of the policy relevant to this case did not change on July 7, 2021. (Doc. 10-5, pp. 2–3).

hospital was abbreviating her pre-resignation window of employment and would regard July 9, 2021 as Ms. Cook's last day. Ms. Bippen wrote:

> I wanted to follow up with you regarding our previous discussion of [Ms. Corey's] orientation and your retirement date. After 41 years of excellence on the job, you will be a difficult person to replace. However, your thorough guidance and education for Ashley Martin and Theresa Corey has been exemplary. Per [the hospital's] resignation policy, we are choosing to waive the remainder of your resignation. This is notice that your final day at work will be July 9th, 2021. This will complete a 10 week orientation for Theresa Corey.

(Doc. 10-15, p. 2). When Ms. Bippen sent the July 1 message, Ms. Cook had not yet submitted a formal resignation letter to the hospital. (Doc. 10-1, p. 51, tpp. 196–97; Doc. 10-1, p. 55, tp. 213). Ms. Cook interpreted Ms. Bippen's email as a notice of termination. (Doc. 10-1, p. 57, tp. 221).

As planned, when Ms. Cook separated from the hospital, the hospital assigned Ms. Cook's duties to Ms. Corey and Ms. Martin. Ms. Martin was 48 years old, and Ms. Corey was 58 years old. (Doc. 10-8, pp. 8–9).

## III.

The ADEA prohibits an employer from discharging or taking other actions adverse to an employee who is at least forty years of age because of the employee's age. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citations omitted); 29 U.S.C. §§ 623(a), 631(a). "The ordinary meaning of the ADEA's requirement that an employer took adverse action because of age is that age was the reason that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S.

8

167, 176 (2009) (citation and quotations omitted).  To succeed in an ADEA discrimination claim, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176 (citation omitted); *see also Sims v. MVM, Inc.,* 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *Gross,* 557 *U.S.* at 129) ("The burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action."). Here, assuming for purposes of summary judgment that Ms. Cook suffered an adverse employment action, her ADEA claim fails as a matter of law because she has not presented evidence that demonstrates that the hospital terminated her employment effective July 9, 2021 because of her age.

Ms. Cook argues that the hospital "targeted" her "due to her age," that "but for [] discussing her retirement, she would still be employed" with the hospital, and that the two employees who assumed her job responsibilities were "significantly younger" than her.  (Doc. 14, p. 6).  The evidence in this case does not support these arguments.

For starters, the record roundly contradicts the notion that Ms. Cook still would be working for the hospital if she had not discussed her retirement.  The record illustrates that Ms. Cook fully intended to retire in 2021; she just vacillated on the date that she would select as her last day of employment.  In February 2021, Ms.

9

Cook decided to retire when she learned that the hospital was assigning her to a new supervisor because she did not want the stress of having to learn about her new supervisor's expectations. (Doc. 10-1, p. 13, pp. 43–45). Three months later, nothing had changed; Ms. Cook still intended to retire and, "after 42+ years" at the hospital, she "wanted to leave on a positive note." (Doc. 14-1, p. 9); *see also* (Doc. 14-2, p. 12) (indicating "positive note" conversation with Ms. Gray took place on May 14, 2021, approximately four months before Ms. Cook's planned September 2021 retirement). In her deposition, Ms. Cook acknowledged that after she advised Ms. Lovelace, Ms. Bippen, and Ms. Gray that she planned to retire in 2021, the hospital made plans to distribute her work to Ms. Corey and Ms. Martin and to have her (Ms. Cook) train Ms. Corey and Ms. Martin before she retired. (Doc. 10-1, p. 20, tp. 72). There is no evidence that suggests that Ms. Cook would have worked for the hospital beyond September 2021.

There also is no evidence that the hospital had secretly made plans to replace Ms. Cook with a younger employee before Ms. Cook announced in February 2021 that she planned to retire later that year. Before she announced her intent to retire, no one at the hospital approached Ms. Cook to discuss retirement. (Doc. 10-1, p. 15, tp. 52). True, the two employees to whom the hospital assigned Ms. Cook's duties were younger than Ms. Cook, but the undisputed evidence demonstrates that Ms. Cook initiated a conversation with Ms. Lovelace, Ms. Bippen, and Ms. Gray

about retirement, not the other way around, and the hospital developed a plan to replace Ms. Cook only after Ms. Cook announced in February 2021 that June 4, 2021 would be her "last day" with the hospital. (Doc. 10-1, p. 20, tp. 72; Doc. 10-4, p. 4). In April 2021, when Ms. Cook sent an email extending her "resignation period," Ms. Cook copied Ms. Martin, one of the two employees who the hospital had tapped to assume her job responsibilities. (Doc. 10-9, p. 2). Ms. Cook acknowledged that she understood that the hospital would have to reassign her duties when she retired, and Ms. Gray and Ms. Bippen included Ms. Cook in their plans for reassigning her duties when she retired. (Doc. 10-1, p. 20, tpp. 71-72).

Finally, nothing in the record suggests that the hospital targeted Ms. Cook for any reason. By choice, Ms. Cook set her retirement into motion in February 2021. By March 2021, the hospital had selected Ms. Martin to handle some of Ms. Cook's responsibilities after Ms. Cook retired, and plans were underway for Ms. Cook to train Ms. Martin. (Doc. 10-7). In mid-April, Ms. Cook sent a message to Ms. Bippen and Ms. Martin to notify them that she planned to work until September and that she was seeking information from the Social Security Administration to help her select her last day of work in September. (Doc. 10-9, p. 2). To the extent that an inference regarding age might be drawn from a reference to the Social Security Administration, it was Ms. Cook's reference. Though Ms. Bippen's decision to designate July 9, 2021 as Ms. Cook's last day deprived Ms. Cook of her opportunity

11

to collect certain benefits that she would have received had she worked for the hospital until September, there is no evidence that Ms. Bippen or anyone else at the hospital abbreviated Ms. Cook's resignation period to punish Ms. Cook for retiring or to allow the hospital to replace Ms. Cook with younger employees in the months before Ms. Cook planned to retire.

At most, the record indicates that Ms. Bippen and Ms. Gray mistakenly believed that Ms. Cook's February 2021 and April 2021 messages concerning her anticipated retirement and her last day at the hospital triggered the hospital's resignation policy which authorized the hospital to truncate the notice period preceding the last date of employment. (Doc. 10-5, p. 4) (resignation policy in place on July 1, 2021); (Doc. 10-15, p. 2 & Doc. 14-2, p. 20) (July 1, 2021 message from Ms. Bippen stating, "Per [the hospital's] resignation policy, we are choosing to waive the remainder of your resignation."). The mistake cannot supply evidence of discriminatory intent, and without evidence of discriminatory intent, Ms. Cook cannot maintain her claim for age discrimination. *Jones v. BE&K Engin. Co.*, 146 Fed. Appx. 356, 359 (11th Cir. 2005) (affirming summary judgment in favor of employer on plaintiff's ADEA claim where plaintiff did not "show any evidence of intent to discriminate" based on the plaintiff's age).

An observer likely would appreciate the challenges the hospital faced waiting for Ms. Cook to finalize her retirement plans so that the hospital could finalize its

transition plans. But an observer likely would measure the hospital's several months of inconvenience against Ms. Cook's 40-year tenure and find her dedicated service more than adequate to earn for her the opportunity to select a date for retirement that would permit her to maximize all benefits available to her. Under these circumstances, the hospital's decision to accelerate Ms. Cook's retirement by just under three months may appear to an observer petty and unprofessional. Nevertheless, the Supreme Court and the Eleventh Circuit have noted repeatedly that the nation's employment laws are not civility codes. Federal courts may not interfere in an employment decision, no matter how poor or unfair, if the decision is not the product of discrimination or retaliation based on a protected category. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007).

## IV.

For the reasons discussed above, the Court grants the hospital's motion for summary judgment on Ms. Cook's age discrimination claims.[4] The Clerk shall please **TERM** Docs. 11 and 12. The Court will enter a final judgment.

**DONE** and **ORDERED** this March 25, 2024.

_____
**MADELINE HUGHES HAIKALA**

---

[4] In *Perry v. Batesville Casket Co., Inc.*, the Eleventh Circuit Court of Appeals stated: "The AADEA uses the same analytical framework as the ADEA." 551 Fed. Appx. 987, 989 (11th Cir. 2014). Therefore, Ms. Cook's AADEA claim fails for the same reasons that her ADEA claim fails.

                                                                UNITED STATES DISTRICT JUDGE

14